ACCEPTED
03-14-00585-CR
5991802
THIRD COURT OF APPEALS
AUSTIN, TEXAS
7/9/2015 9:31:15 AM
JEFFREY D. KYLE
CLERK

NO. 03-14-00585--CR

IN THE COURT OF APPEALS
FOR THE
THIRD SUPREME JUDICIAL DISTRICT OF TEXAS
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
7/9/2015 9:31:15 AM
JEFFREY D. KYLE
Clerk

NO. 13-2081-K277

IN THE 277TH DISTRICT COURT
OF WILLIAMSON COUNTY, TEXAS

LEOVARDO CANTOS,
APPELLANT

V.

STATE OF TEXAS,
APPELLEE

APPELLANT'S BRIEF

ORAL ARGUMENT REQUESTED

LINDA ICENHAUER-RAMIREZ
ATTORNEY AT LAW
1103 NUECES
AUSTIN, TEXAS    78701
TELEPHONE:    512-477-7991
FACSIMILE 512-477-3580
EMAIL:    LJIR@AOL.COM
SBN:    10382944

ATTORNEY FOR APPELLANT

# **TABLE OF CONTENTS**

**PAGE**

Parties to Trial Court's Final Judgment........................................................3

Index of Authorities..............................................................................4

Statement of the Nature of the Case .........................................................5

Statement of the Point of Error...............................................................6

Statement of Facts...............................................................................7

Summary of the Argument ....................................................................19

Point of Error Number One ..................................................................21

Prayer for Relief ...............................................................................29

Certificate of Service..........................................................................29

Certificate of Compliance.....................................................................30

## PARTIES TO TRIAL COURT'S FINAL JUDGMENT

In accordance with Tex.R.App.Proc. 38.1(a), Appellant certifies that the following is a complete list of the parties and their counsel:

(a) the State of Texas represented by:

    Mr. Josh Reno, Assistant District Attorney
    Williamson County District Attorney's Office
    405 Martin Luther King, Suite 1
    Georgetown, Texas 78626

    Ms. Jackie Borcherding, Assistant District Attorney
    Williamson County District Attorney's Office
    405 Martin Luther King, Suite 1
    Georgetown, Texas 78626

(b) Mr. Leovardo Cantos represented by:

    Mr. Alfonso C. Hernandez – trial attorney
    Attorney at Law
    507 W. 10th Street
    Austin, Texas 78701

    Mr. Rene Vargas – trial attorney
    Attorney at Law
    507 W. 10th Street
    Austin, Texas 78701

    Ms. Linda Icenhauer-Ramirez - appellate attorney
    Attorney at Law
    1103 Nueces
    Austin, Texas 78701

# INDEX OF AUTHORITIES

**CASES**                                                        **PAGE**

Albrecht v. State, 486 S.W.2d 97, 100-101 (Tex.Cr.App. 1972) ............... 24

Carter v. State, 145 S.W.3d 702 (Tex.App.-Dallas 2004, pet. ref.)............ 23

Dekneef v. State, 379 S.W.3d 423, 433 (Tex.App.-Amarillo 2012, pet. ref.)....................................................................................... 26

Elkins v. State, 647 S.W.2d 663 (Tex.Cr.App. 1983) ........................ 23, 24

Escort v. State, 713 S.W.2d 733 (Tex.App.-Corpus Christi 1986, no pet.) ..................................................................................... 25, 28

Gigliobianco v. State, 210 S.W.3d 637, 641-641 (Tex.Cr.App. 2006) ........................................................................................ 26

Montgomery v. State, 810 S.W.2d 372, 386 (Tex.Cr.App. 1991) (opinion on rehearing) ................................................................... 24

Powell v. State, 63 S.W.3d 435, 438 (Tex.Cr.App. 2001) ........................ 24

Williams v. State, 662 S.W.2d 344, 346 (Tex.Cr.App. 1983)............... 23, 24

**STATUTES**

V.T.C.A. Penal Code, Sec. 22.02(a)(1) ........................................................ 7

**COURT RULES**

Tex.R.App.Proc. 38.1(a)............................................................................... 3

Tex.R.Ev. 403 ................................................................................... 24, 26, 28

Tex.R.Ev. 404(b) ........................................................................ 21, 22, 23, 24

TO THE HONORABLE JUDGES OF SAID COURT:

COMES NOW Leovardo Cantos, appellant in this cause, by and through his attorney and files this his brief on original appeal.

## STATEMENT OF THE NATURE OF THE CASE

Appellant was charged by indictment in this cause on February 18, 2014. The indictment alleged that appellant committed the offense of aggravated assault with serious bodily injury. It also contained a deadly weapon allegation. (C.R. 11) Jury selection occurred on July 28, 2014. (R.R. V, pp. 24-215) On July 29, 2014, appellant entered a plea of not guilty. (R.R. VI, p. 16) On July 31, 2014, after hearing the evidence and the argument from counsel, the jury deliberated and returned a verdict of guilty of the offense of aggravated assault. The jury also made an affirmative finding that appellant used a deadly weapon. (R.R. X, pp. 122-123; C.R. 58-68) Appellant elected to go to the trial court for sentencing. On August 11, 2014, after hearing the evidence and argument from counsel, the trial court assessed appellant's punishment at fifteen (15) years imprisonment. (R.R. XII, pp. 50; C.R. 79-82) A motion for new trial was filed on September 10, 2014. (C.R. 76-77) Notice of appeal was filed on September 10, 2014. (C.R. 78) The trial court's certification of defendant's right to appeal was filed on November 6, 2014. (C.R. 86)

## STATEMENT OF THE POINT OF ERROR

### POINT OF ERROR NUMBER ONE

**THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING INTO EVIDENCE THE EXTRANEOUS OFFENSE WHEN THE RECORD CLEARLY SHOWED THAT THE PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED ITS PROBATIVE VALUE.**

## STATEMENT OF FACTS

The indictment in this case alleged that appellant committed the offense of aggravated assault with a deadly weapon and specifically alleged that appellant:

> "on or about the 14th day of November, 2013, . . . intentionally, knowingly, or recklessly caused serious bodily injury to Juan Davila, by kicking or stomping Juan Davila with the defendant's feet," (C.R. 11)

V.T.C.A. Penal Code, Sec. 22.02(a)(1). The indictment also contained notice that the State would be seeking an affirmative finding of a deadly weapon. (C.R. 11)

The evidence showed that both appellant and the complainant played in a competitive amateur softball league in Round Rock, Texas. Appellant had a reputation among softball players as being a very aggressive and competitive player. Appellant played for a team called FYC and the complainant played for a team called TKO. The two teams played each other on the evening of November 14, 2013. (R.R. VI, pp. 33-39, 115, 242; R.R. VIII, pp. 47-50) Towards the end of the game, appellant and the complainant were involved in a play at second base. Appellant was playing second base and the complainant was a base runner on first base. Witnesses testified that when the batter hit the ball, the complainant ran

towards second base, rounded second base and then fell down somewhere between second and third base. In an effort to get back to second base the complainant dove back into second base headfirst. In the process of diving back into second base, the complainant's shoulder made contact with appellant's knee. (R.R. VI, pp. 42-48, 119-122, 242-244; R.R. VII, pp. 7, 33; R.R. VIII, pp. 51-54; 99-102; R.R. IX, pp. 35-36, 75-76; R.R. X, pp. 20-23) One witness, Danny Teller, a player from appellant's team testified that after the complainant slid into appellant, appellant fell to the ground and complained that his knee had been hurt in the collision. He testified that appellant got back to his feet and pushed the complainant down as he was trying to get to his feet. (R.R. VI, p. 48) Umpire Gary Clements described the play at second base as "incidental contact." He testified that appellant was upset at the complainant after the play because his knee had been hurt. (R.R. VI, pp. 122-123) All of the witnesses testified that words were exchanged between appellant and the complainant. Play resumed after the umpires admonished the two men. (R.R. VI, pp. 49, 123-124, 161-163, 244; R.R. VII, p. 7)

During the next half inning, the complainant's team, TKO, took the field with the complainant playing first base. Danny Teller, appellant's teammate, testified that while his team was in the first base dug-out waiting

8

to bat, he heard appellant say, "Yes, you have something coming to you." Teller testified that he batted and got on second base. Appellant was the next batter and hit the ball to the pitcher. The pitcher fielded the ball and made an under-handed throw to the complainant who was playing first base. However, because the throw was short, the complainant had to take a step or two in front of the first base bag in order to catch the ball. Witnesses testified that as appellant ran towards first base, he threw his hands up into the complainant's face and ran the complainant over. Umpire Gary Clements said that appellant was initially jogging towards first based and then within his last four or five steps accelerated as he charged the complainant. The complainant was knocked down and after appellant knocked the complainant down, he turned out towards the fence. Witnesses testified that the complainant got to his feet, still holding the softball. It appeared as if the complainant was going to throw the softball at appellant but then the complainant apparently changed his mind and threw the ball towards the appellant's foot. Danny Teller, Umpire Clements and Marty Jenkins testified that the ball hit the ground and never hit the appellant. Two other players, John Crowder and Karl Holdren, testified that the ball ricocheted off of appellant and when that occurred, appellant turned around and went back towards the complainant. Gabriel Orozco, a

9

defense witness, testified that the complainant threw the ball and it hit appellant in the thigh. Teller and Clements testified that the two men then came together and began "jawing" at each other. Both men were agitated. Teller and Orozco testified that the two men began throwing punches. Clements testified that the complainant never swung at appellant. Clements and Jackson testified that appellant struck the complainant and knocked him to the ground. Teller testified that by this time other players had run up to the two men and blocked Teller's view, but he did see that the complainant was on the ground and he saw someone kicking the complainant. Umpire Clements testified that he saw appellant kick the complainant in the head. He also testified that he never saw the complainant swing at appellant or pull out any kind of weapon before he was kicked. Douglas Peterson, who played on the complainant's team echoed the testimony of Teller and Clements. He testified that the complainant never made a move towards appellant. After appellant shoved the complainant to the ground the last time, he saw appellant kick the complainant in the face and shoulder area with a hard kick. Then appellant jumped on top of the complainant. Peterson testified that he ran over and knocked appellant off of the complainant. Peterson testified that appellant was the aggressor. Karl Holdren also testified that appellant tackled the

complainant and then got up and kicked the complainant hard in the face two times. Marty Jackson, another softball player told the jury that he did not see appellant kick the complainant in the head but afterwards he saw red marks on the complainant's head. Off duty police officer Brian Hollywood, who was a pick up player in the game, also testified that he saw appellant kick the complainant "unbelievably hard." (R.R. VI, pp. 49-59, 128-148, 245-252; R.R. VII, pp. 8-20, 35-43; R.R. VIII, pp. 55-61; 102-106; R.R. IX, pp. 36-39, 78-83; R.R. X, pp. 24-35)

Both men were ejected from the game for fighting and appellant was told to leave the area, which he did. The complainant, although ejected from the game, stayed outside the fence and watched the conclusion of the game. (R.R. VI, pp. 60-61, 253; R.R. IX, pp. 40-42, 84-85)

Witnesses testified that it is against the rules to make contact with another player in amateur softball. (R.R. VI, pp. 56, 92-93, 113-114; R.R. VIII, p. 84, 98) All but one witness, defense witness Andria White, testified that appellant was the aggressor and that the complainant did nothing to provoke appellant's attack. (R.R. VI, p. 73; R.R. VIII, pp. 85-87; 107) White, who was watching the game, testified that the complainant's slide into second base was a very aggressive slide and she considered it a dirty play. (R.R. X, p. 43) Brian Hollywood, the police

11

officer who was playing in the game and who was off duty at the time testified that he believed appellant had assaulted the complainant and so he called the Round Rock police and an officer responded to the softball field. Hollywood also testified that a foot can be a deadly weapon if it causes serious bodily injury.   (R.R. VIII, pp. 110-113)

Danny Teller, Karl Holdren and Marty Jackson all testified that shortly after the game, they looked at appellant's Facebook account and saw appellant had posted the following:

> "I guess next time you will think twice about taking out someone's knee in softball.   Haha!   How's your face? Cause my foot is killing me!!!   Not to mention how far u flew when u were "standing your ground."   Lmao.    U picked the wrong Mexican homeboy!!!"    (R.R. VI, p. 68)    (State's Exhibit 2)

This posting was introduced into evidence by the State as State's Exhibit 2 over appellant's objection.    (R.R. VI, pp. 65-68; R.R. VII, pp. 44- 45; R.R. VIII, pp. 62, 76)

The complainant, Juan Davila, testified and told the jury that he remembered playing in the softball game that night.   He testified that when he dove back into second base, his shoulder collided with appellant's knee.   He told the jury that he did not know appellant and was not intentionally trying to hurt him.   Davila testified about the play at first base. He testified that after he caught the ball from the pitcher, he had his right

12

foot on the first base bag.    He told the jury that he then stepped off the bag and threw the ball to the shortstop.   He told the jury that he remembered having words with appellant and he remembered throwing the ball down in front of appellant.   Davila told the jury that he thought the ball hit appellant after it bounced.    He testified that he did not remember hitting appellant. The last thing he remembered was being on the ground.    Appellant told the jury that he has no memory of the incident after that point.   (R.R. VI, pp. 195-206)   The evidence showed that the complainant spent that night at his girlfriend's house.    The next morning the complainant's sister persuaded him to go the emergency room.   (R.R. VI, pp. 207-211)    At the emergency room, doctors discovered that the complainant had suffered a serious brain injury.    The complainant had to undergo major brain surgery and was hospitalized for approximately one week.    He was then released to a rehabilitation facility where he stayed for one month, followed by months of outpatient therapy.    The evidence showed that he was not able to return to work until May of 2014, some six months after the incident. Appellant testified that as a result of his brain injury, he has memory issues, his temper and impulsiveness is bad in that he overreacts to situations.    He also has trouble navigating around town or even remembering where he has parked his car.    Finally, the complainant told the jury that he has a blind

spot in his peripheral vision. (R.R. VI, pp. 214-226) The complainant's friend and fellow ball-player, Doug Peterson testified that as a result of his brain injury, the complainant's personality is totally different and he has a very bad memory. (R.R. VI, pp. 254-255) The complainant's best friend Karl Holdren testified that as a result of his injury, the complainant has become angry, short-tempered and has memory issues. (R.R. VII, p. 54) Marty Jackson, another friend of the complainant also testified that the complainant's personality is different and that it takes him longer to react to things like joking and teasing. (R.R. VIII, p. 65)

Dr. Ernest Gonzalez, a trauma surgeon, testified that on November 15, 2013, he was working at St. David's Hospital in Round Rock when the complainant came to the emergency room. Dr. Gonzalez testified that initially appellant was awake and able to converse although he said he was not feeling well. He was placed in ICU so that doctors could monitor his condition overnight. Dr. Gonzalez also had the complainant undergo a CT scan. This scan showed that the complainant had multiple fractures of his foreface, his orbital roof, with bleeding in the subdural, as well as bruising on the right frontal lobe of his brain tissue. Dr. Gonzalez told the jury that these injuries were caused by blunt force trauma. Dr. Gonzalez testified that as they monitored the complainant, his condition worsened and

he had to undergo emergency brain surgery in order to evacuate the blood from his brain. He testified that the complainant probably would have died without the surgery. The complainant was discharged from the hospital on November 22, 2013 and was put in inpatient rehabilitation followed by outpatient rehabilitation. Dr. Gonzalez testified that the complainant's injuries constituted serious bodily injury in that he faced a substantial risk of death due to the injury to his brain. The doctor also testified that a foot used to kick someone in the head with the same resulting injuries could be a deadly weapon. (R.R. VIII, pp. 13-40)

Rosie Hernandez, the complainant's girlfriend, testified that the complainant came home the night of the incident and seemed disoriented and upset. He told her that he had gotten into a fight and she could see marks on his forehead. Hernandez testified that the complainant complained of a headache and he was up and down all night. He also began vomiting. Hernandez told the jury that the next morning she saw that the complainant's right eye was turning purple. Hernandez told the jury that she left for work and later in the morning when the complainant would not respond to her texts, she called his sister and asked her to check on him. They were able to persuade the complainant to go to the hospital later in the day. Hernandez testified that the complainant had to have brain

15

surgery and was hospitalized for one week. After being discharged from the hospital, he spent about a month in a rehabilitation facility. (R.R. VIII, pp. 183-206) Hernandez testified as to the changes in the complainant after the incident. She told the jury that it was as if he had lost his filter. She testified that the complainant now says inappropriate things. He has lost his sense of direction. He is forgetful. His mood fluctuates and he often is sad and cries. She also told the jury that he has a blind spot in his eye and cannot see things, causing him to bump into things. (R.R. VIII, pp. 207-213) The complainant's sister, Patricia Cortez, told the jury how she went to check on the complainant the morning after the incident. He was disoriented and vomiting. She testified that she drove him to the hospital where doctors discovered that his brain was swelling and he had to undergo emergency brain surgery. She described the complainant as an angry person since his brain injury. (R.R. VIII, pp. 217-224)

After both sides rested and closed, the State made an oral motion to strike the "or stomping" language from the indictment. The trial court granted that request. (R.R. X, p. 65) The jury heard argument from both sides, deliberated and then announced its verdict. The jury found appellant guilty of the offense of aggravated assault as alleged in the indictment. The jury also made an affirmative finding of a deadly weapon.

(R.R. X, pp. 122-123; C.R. 58-68 )

Appellant elected to go to the trial court for punishment. The State introduced into evidence various State's Exhibits showing some of appellant's prior convictions: State's Exhibit 24 – a conviction for evading arrest in Cause No. 08-07320-1 in County Court at Law No. 1 of Williamson County on February 12, 2009; State's Exhibit 25 – a conviction for felony DWI in Cause No. D1-DC-09-907397 in the 331st District Court of Travis County on July 26, 2010; State's Exhibit 26 – a conviction for another felony DWI in Cause No. D1-DC-10-201406 in the 331st District Court of Travis County on July 26, 2010 and State's Exhibit 27 – a conviction for assault on a public servant in Cause No. D1-DC-10-201407 in the 331st District Court of Travis County, Texas on July 26, 2010. (R.R. XI, pp. 15-16) The State also introduced State's Exhibits 28, 29, 30 and 31 – recordings of some of appellant's phone calls from the Williamson County Jail. (R.R. XI, pp. 16-19) The State then rested.

Dr. Matthew Ferrara, a psychologist, testified for the defense. He told the court that he had evaluated appellant and found six mitigating factors to consider when assessing punishment: (1) he suffered post-traumatic stress disorder that had occurred during his military service; (2) his loss of a paternal figure as a child (his father had died when he was

in fifth grade); (3) his mother never showed him love; (4) he saw domestic violence in his home between his parents; (5) he was a victim of sexual abuse as a child; and (6) he has a substance abuse problem. Dr. Ferrara testified that there is treatment available for each one of these factors. He also testified that appellant will become less aggressive as he ages. (R.R. XI, pp. 21-36)

Appellant's wife also testified and told the court that appellant was a great husband and father and a good man. She also testified that after the incident when he learned how serious the complainant's injuries were, he was remorseful. (R.R. XII pp. 6-9) Appellant's two sons and one of their friends also testified as character witnesses for appellant. (R.R. XII, pp. 14-20) The defense then rested and the State called Officer Andrew McRae in rebuttal. McRae testified that he had arrested appellant twice for the offense of driving while intoxicated – once on April 21, 2009 and again on March 12, 2010. He gave the details of each arrest to the court. (R.R. XII, pp. 22-33) After McRae's testimony, the State rested and both sides closed. (R.R. XII, pp. 33-35) After hearing the argument of counsel from both sides, the trial court assessed appellant's punishment at fifteen years imprisonment. (R.R. XII, p. 50; C.R. 79-81)

## SUMMARY OF THE ARGUMENT

In his sole point of error, appellant argues that the trial court abused its discretion when it allowed the State to introduce an extraneous offense into evidence because the prejudicial effect of that evidence far outweighed any probative value that the evidence had. As its last witness during the guilt-innocence phase of the trial, the State brought in APD Officer Andrew McRae who testified that while appellant was in his custody on another charge, appellant threatened him with physical harm and in fact did kick the police car door as the officer was opening it to remove appellant from the vehicle. As a consequence the officer sustained a sprained wrist because he was holding onto the door handle when appellant kicked the car door. The State argued that they needed to use this extraneous offense to rebut appellant's theory of self-defense, to show his intent and to show his lack of mistake. Appellant asserts that the relevance of the extraneous offense testimony did not outweigh the inherent prejudicial and inflammatory effect of the testimony. The prosecution put on overwhelming evidence of appellant's guilt. Not only were there numerous eyewitnesses who testified that it was appellant who kicked the complainant in the head, the State introduced State's Exhibit 2, a Facebook entry, appellant posted some ten minutes after the attack, boasting of kicking the complainant in the face.

The State did not need the extraneous offense at all. The prejudicial and inflammatory effect of the admission of the extraneous offense into evidence was far greater than any probative effect. The trial court abused its discretion in allowing the extraneous offense into evidence.

## POINT OF ERROR NUMBER ONE
**THE TRIAL COURT ABUSED ITS DISCRETION IN ADMITTING INTO EVIDENCE THE EXTRANEOUS OFFENSE WHEN THE RECORD CLEARLY SHOWED THAT THE PREJUDICIAL EFFECT OF THE EVIDENCE FAR OUTWEIGHED ITS PROBATIVE VALUE.**

During his opening argument defense counsel argued that appellant was acting in self-defense when the complainant was injured. (R.R. VI, pp. 25-31) On the second day of the evidence, the State announced that because appellant had argued self-defense in his opening statement, he had opened the door and thus the State should be allowed to introduce evidence of appellant's prior conviction for assault on a public servant. The State argued that appellant was not acting in self-defense but rather his motive was to hurt the complainant after the incident at second base. The State argued that the extraneous offense should be admissible under Tex.R.Ev. 404(b) to show appellant's intent and lack of mistake. Appellant objected on the basis that a theory of self-defense did not open the door to other violent acts and even if it did, this evidence would be far more prejudicial than probative. The trial court asked the parties to provide her case law and took the matter under advisement. (R.R. VIII, pp. 5-11) Later after reading the case law, the trial court informed the parties that she would allow the State to put on evidence regarding the actual incident but would

not allow the jury to know that appellant had been convicted for that offense. (R.R. VIII, pp. 126-128)     Immediately before the extraneous offense was put before the jury, the defense renewed its objection to the admissibility of the extraneous offense under Tex.R.Ev. 404(b) and also argued that admission of this evidence would be more prejudicial than probative.     The court after hearing the witness testify outside the presence of the jury overruled appellant's objection and ruled that she was admitting the extraneous offense to rebut a defensive theory of self-defense.   She ruled that the State could use the evidence to show lack of mistake and intent. She did however restrict the State from introducing evidence as to why the officer was arresting appellant or the fact that appellant had been convicted of assaulting a public servant because of the this incident.   (R.R. IX, pp. 4-18)

Immediately thereafter, Officer Andrew McRae of the Austin Police Department was allowed to testify in front of the jury.   He told the jury that on March 12, 2010, while on patrol, he arrested appellant.     Appellant was put in the back of the patrol car.   McRae testified that while he was transporting appellant, appellant threatened him:

"Q.    . . . Can you tell the jury what statements the defendant was making to you?

"A.    He made several statements.   "Open these doors.

22

See if I don't punch you in the face.    Get someone else to open up this door.   I swear to God you open this door, I'm going to fuck you up.   I'm not even playing.   Seriously, bro, when we get to the fucking station, get somebody else to open the fucking door because if you're anywhere near me, ooh." (R.R. IX, pp. 28-29)

McRae went on to testify that when they reached their destination, the appellant had turned so that his back was facing away from the door. When McRae opened the back door of the police car, appellant kicked the door very hard causing McRae, who was holding the door handle to sprain his wrist.    McRae told the jury that appellant's action caused him pain in his wrist that lasted for one or two days.    (R.R. IX, p. 29)    On cross, defense counsel established that appellant had been asking Officer McRae to be allowed to use the restroom and the officer had not allowed him to do so. As a consequence, appellant had urinated all over himself.    (R.R. IX, pp. 30-31)

The general rule regarding the admissibility of extraneous offenses is that an accused may not be tried for a collateral crime or for being a criminal generally.   Tex.R.Ev. 404(b); Williams v. State, 662 S.W.2d 344, 346 (Tex.Cr.App. 1983); Elkins v. State, 647 S.W.2d 663, 665 (Tex.Cr.App. 1983); Carter v. State, 145 S.W.3d 702, 707 (Tex.App.-Dallas 2004, pet. ref.).    Introduction of an extraneous offense is inherently prejudicial, and a defendant's "propensity to commit crimes" is not material to whether the

23

defendant committed the specific offense charged.    Williams v. State, 662 S.W.2d at 346; Elkins v. State, 647 S.W.2d at 665.

There are exceptions to the general rule barring admission of extraneous offenses.    An extraneous offense committed by the accused may be admissible "upon a showing by the prosecution both that the [extraneous offense] is relevant to a material issue in the case; and the relevancy value of the evidence outweighs its inflammatory or prejudicial potential." (emphasis added).    Williams v. State, 662 S.W.2d at 346. Thus an extraneous offense may be admissible to show the motive or intent of the accused or to refute a defense theory.    See Tex.R.Ev. 404(b); see also Powell v. State, 63 S.W.3d 435, 438 (Tex.Cr.App. 2001); Montgomery v. State, 810 S.W.2d 372, 386 (Tex.Cr.App. 1991)(opinion on rehearing). Albrecht v. State, 486 S.W.2d 97, 100-101 (Tex.Cr.App. 1972).    Even if it is admissible, however, its relevance and materiality must still be shown to outweigh its prejudicial effect.    See Tex.R.Ev. 403; Montgomery v. State, supra; Williams v. State, 662 S.W.2d at 346.    A relationship must be shown between the extraneous offense "and the evidence necessary to prove the accused committed the crime for which he stands charged . . . ."    Albrecht v. State, 486 S.W.2d at 100.

Appellant asserts that the relevance of the extraneous offense

24

testimony did not outweigh the inherent prejudicial and inflammatory effect of the testimony. The prosecution put on overwhelming evidence of appellant's guilt. All of the eyewitnesses testified that it was appellant who was involved in the altercation with the complainant. Several of the witnesses testified that they saw the appellant actually kick the complainant in the head and there was no evidence introduced which showed that it was anyone else or that appellant was justified in his action of kicking the complainant in the head. Furthermore, the State introduced into evidence State's Exhibit 2, a Facebook post which appellant posted on his Facebook page some ten minutes after the incident. It read:

> "I guess next time you will think twice about taking out someone's knee in softball. Haha! How's your face? Cause my foot is killing me!!! Not to mention how far u flew when u were "standing your ground." Lmao. U picked the wrong Mexican homeboy!!!" (R.R. VI, p. 68) (State's Exhibit 2)

A review of all of the evidence shows that the State put on more than enough evidence about the incident alone to refute appellant's self-defense theory. As the Corpus Christi Court of Appeals wrote in <u>Escort v. State</u>, 713 S.W.2d 733 (Tex.App.-Corpus Christi 1986, no pet.), a case very similar to this in its procedural posture:

> "The extraneous offense evidence was simply 'overkill,' and it went too far. 713 S.W.2d at 737.

Where all if not most of the direct evidence adduced during the trial rebuts the theory of self-defense and goes to prove an accused's intent, the less relevant is evidence involving a collateral offense between the accused and a third party. Considering the overwhelming evidence of appellant's guilt both from eyewitness accounts and appellant's Facebook post, the evidence regarding appellant's unrelated act towards Officer McRae, could not have been that helpful to the jury in resolving the issue of self-defense. Thus the relevancy of the extraneous offense is questionable. Thus the prejudice emanating from the admission of the extraneous offense far outweighed any probative value that it could have had.

In assessing whether potentially relevant evidence should be excluded under Tex.R.Ev. 403 because its prejudicial nature substantially outweighs its probative value, the appellate court must consider 1) the probative force of the evidence, 2) the need for the evidence, 3) the tendency of the evidence to suggest a decision on an improper basis, 4) the tendency of the evidence to confuse or distract the jury, 5) the tendency of the evidence to be given undue weight, and 6) the likelihood that the presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. Gigliobianco v. State, 210 S.W.3d 637, 641-641 (Tex.Cr.App. 2006); Dekneef v. State, 379 S.W.3d 423, 433 (Tex.App.-Amarillo 2012,

pet.ref.). The first four of those criteria clearly favored excluding the testimony at issue. Its probative value or relevance was marginal at best. The State had little need for it. Attributing to an accused prior criminal conduct is undoubtedly prejudicial and facilitates the jury's penchant to infer present guilt from prior criminal conduct. In appellant's case, the prejudicial testimony came from the State's last witness at guilt-innocence, a police officer, called only for the purpose of soliciting that prejudicial testimony. As for the last indicia, not much time was spent on presenting the evidence, but the potentially unacceptable impact it had due to its timing is evident. In addition both prosecutors emphasized the extraneous offense during their closing arguments at guilt-innocence. Prosecutor Jackie Borcherding argued the following:

> "The defendant had the intent to assault Juan, and the reason why we know that is because he had statements made right before he assaulted Juan, and we know that in the past – You can consider an extraneous offense – the fact that he told Officer McRae in 2010 that essentially – the quote was, 'I swear to God, you open this door, I'm going to fuck you up. I'm not even playing. When we get to the fucking station, get somebody else to open the fucking door because if you're anywhere near me, oh.' And he carried through with his threat, and he kicked the door open, and it hurt Officer McRae. That shows his intent to hurt Juan, and the reason why is because in our case, he made threatening statements. 'You'll get yours.' 'You'll have what's coming to you.' And he carried through with that threat by kicking – kicking again, this time Juan. That extraneous offense is relevant to show you his intent, that he's not defending himself. . . . " R.R. X, pp.

89-90.

Prosecutor Josh Reno encouraged the jury not to consider the extraneous offense as a tool to consider appellant's intent but rather he urged the jury to improperly consider the extraneous offense as evidence of appellant's assaultive character:

> "Yeah, we brought you an assaultive case that happened out of Austin.     He's assaultive.     This defendant has an assaultive history, and you need to know that why?     Because now that we've proven our case beyond a reasonable doubt, he's claiming self-defense.     He's saying, 'Yeah, I assaulted you, Juan, but I had to.     I had to.     I had to defend myself.' Really?     Really?" . . .     This defendant makes threats, and then he makes good on them just like he did with Andrew McRae, the officer with the Austin Police Department."     (R.R. X, pp. 113-114)

Reasonable minds cannot disagree over the application of Tex.R.Ev. 403 here; the prejudicial effect of disclosing that appellant had a prior arrest and during that arrest assaulted a police officer far outweighed any minimal probative value the evidence may have had.[1]   The trial court clearly abused its discretion in admitting the extraneous offense.   This point of error should be sustained.

---

[1] Appellant acknowledges that the trial court did submit a limiting instruction regarding the extraneous offense testimony in its charge to the jury.     (C.R. 58-68)     However, appellant asserts that just as the Corpus Christi Court of Appeals found in Escort v. State, 713 S.W.2d 733, 737-738 (Tex.App.-Corpus Christi 1986, no pet.), the instruction had no curative value "in obviating the inflammatory effect of the inadmissible evidence".

## PRAYER

Appellant respectfully requests that this Honorable Court sustain his point of error and reverse the trial court and remand the case for a new trial.

Respectfully submitted,

/s/ Linda Icenhauer-Ramirez
LINDA ICENHAUER-RAMIREZ
Attorney at Law
1103 Nueces
Austin, Texas 78701
(512) 477-7991
FAX: (512) 477-3580
SBN: 10382944
Email: ljir@aol.com

ATTORNEY FOR APPELLANT

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was computer generated and contains 5,834 words, as calculated by the word count function on my computer.

/s/ Linda Icenhauer-Ramirez
LINDA ICENHAUER-RAMIREZ

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Appellant's Brief on Original Appeal served by e-service to John Prezas of the Williamson County District Attorney's Office on this the 9th day of July, 2015.

/s/ Linda Icenhauer-Ramirez
LINDA ICENHAUER-RAMIREZ